UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH M. GORA,

          Plaintiff,

v.

RAYMOND GELABERT, *et al.*,

          Defendants.

_____/

Case No. 1:08-cv-992

Hon. Gordon J. Quist

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on a motion for summary judgment filed by the three remaining defendants, Raymond Gelabert, M.D., Savithri Kakani, P.A., and Correctional Medical Services, Inc. (CMS)(docket no. 81). The motion is unopposed.

## I.      Background

Plaintiff filed suit against five defendants alleging that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Plaintiff's original 29-page complaint, was a rambling and virtually incomprehensible account of alleged medical problems that he experienced at the Gus Harrison Correctional Facility (ARF) and Florence Crane Correctional Facility (ACF). The gist of the complaint was that the prison medical staff denied plaintiff pain medication and ignored serious gall bladder problems. The court has dismissed two defendants. Plaintiff filed a second amended complaint which names the three remaining defendants, Dr. Gelabert, P.A. Kakani, and CMS.

The court previously found that plaintiff had properly exhausted grievances ACF 2007-07-1261-12f ("1261") and ACF 2008-07-608-12f3 ("608") with respect to three claims: (1) that P.A. Kakani denied plaintiff adequate pain medication (Neurontin); (2) that CMS, Dr. Gelabert and P.A. Kakani denied plaintiff adequate pain medication (Ultram); and (3) that CMS, Dr. Gelabert and P.A. Kakani failed to treat plaintiff's gallstones.  Report and Recommendation (R&R) at p. 7 (docket no. 39); Amended Order adopting the R&R in part and rejecting the R&R in part(docket no. 50).

Plaintiff's second amended complaint has alleged that on June 25, 2007, P.A. Kakani refused to give him adequate medication for abdominal pain, causing injuries to his stomach and intestines and vascular problems, and that Kakani also failed to prescribe adequate medication for his back pain, which caused him to fall and injure himself.  Second Amend. Compl. at p. 5.  This is the only claim against P.A. Kakani.

Plaintiff's second amended complaint included four claims (or groups of claims) directed at Dr. Gelabert which arise the claims asserted in grievances 608, ACF 2008-07-564-12d1 ("564"); ACF-2008-08-765-12F2 ("765"); and ACF-2008-09-0822-12F3 ("822").

One group of claims occurred on or about June 6, 2008 and were exhausted in grievance 564.  In these claims, plaintiff alleged that Dr. Gelabert: refused to send plaintiff to a specialist for treatment of his gallstones; allowed plaintiff to suffer severe abdominal pain, nausea, and severe pain when he ate food; allowed plaintiff to suffer from constipation, diarrhea and severe abdominal pain; refused to call plaintiff out "for a couple of months" when he first arrived at ACF; caused plaintiff  to lose 35 pounds and his gall bladder; and allowed plaintiff's current pain medication to expire "for no reasons whatsoever."  Second Amend. Compl. at p. 6.

Another group consists of three claims which commenced on July 9, 2008 and which were exhausted in grievance 608.  In these claims, plaintiff alleged that Dr. Gelabert: refused to give him proper and adequate pain medication after plaintiff fell and injured his head, neck and lower spine; refused to provide adequate pain medication for his abdominal pain, heart burn and severe gall stones; and refused to send plaintiff to a specialist for removal of the gall stones.  Second Amend. Compl. at p. 5.

Another group of claims commenced on or about August 26, 2008 and were exhausted in grievance 765.  In these claims, plaintiff alleged that Dr. Gelabert: allowed plaintiff's pain medication to expire for no reason, causing him "horrible pain" from gall bladder problems and post-surgical lower back pain; "neglected his duty as a physician to his patient to make sure his patient was not suffering;" and engaged in "[i]ntentional maltreatment and a refusal to provide essential care mandated by law, and the Constitution."  Second Amend. Compl. at p. 6.

A final group of claims commenced on or about September 9, 2008 and were exhausted in grievance 822.  In these claims, plaintiff alleged: that on September 9, 2008, Dr. Gelabert refused to prescribe pain medication four times a day after plaintiff's surgery for gall bladder removal as recommended by Surgeon Delong; that due to the lack of post-surgery pain medication, plaintiff was unable to sleep or eat and suffered unnecessary pain after surgery; and that Dr. Gelabert told plaintiff to purchase Motrin from the prison store when he was indigent and could not pay for the pain medication.  *Id.* at p. 7.

3

## II.     Defendants' motion for summary judgment

### A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2nd Cir. 1996). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).[1]

## B.   Plaintiff's history of treatment

The record reflects that plaintiff was incarcerated at ARF from 2006 through June 6, 2008, at which time he was transferred to ACF. MDOC Medical Records, Exh. B-1 at pp. 230-32 (docket no. 82-2).[2] Plaintiff was released on parole on May 5, 2010. *See* MDOC Offender Tracking Information (OTIS) profile for Joseph Matthew Gora  (docket no. 81-2). The resolution of plaintiff's claims require the court to review the medical treatment provided to him over a number of years. In their brief, defendants summarize plaintiff's medical history as reflected in his medical

---

[1] The court notes that plaintiff included the following statement at page 7 of the second amended complaint, "Authentication by Verification has been examined by me [sic] and that it's [sic] contents are true to the best of my Personal Information, Knowledge and Belief." This statement appears to be an attempt to create a verified complaint, which could serve as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). However, plaintiff's statement did not create a verified complaint because the statement was not an unsworn declaration made under penalty of perjury as required under 28 U.S.C. § 1746. Even if plaintiff had prepared a proper verification, it would not affect the court's analysis, because plaintiff made only conclusory allegations which did not address the facts set forth in his medical records.

[2] In their brief, defendants cited plaintiff's medical records as "Exhibit B, p. ___". The hard copy of plaintiff's medical records submitted to the court consist of a single exhibit, i.e., Exhibit B. However, for purposes of electronic filing in this court, defendants have split this large exhibit into two documents, identified as Exhibit B-1 (pp. 138-425) (docket no. 82-1) and Exhibit B-2 (pp. 433-804) (docket no. 82-2).

records generated at the MDOC.  This undisputed medical record establishes that plaintiff received

*extensive* medical treatment while he was incarcerated at both ARF and ACF.  Given the issues in

this case, the court will reproduce this undisputed summary of plaintiff's medical history below:

> The first time that P.A. Kakani became involved in Plaintiff's medical care was on 12/20/05, at ARF for a chronic care clinic appointment. (Exhibit B, pp. 518-521). After taking a verbal history from Plaintiff and performing an objective examination, P.A. Kakani assessed Plaintiff with hyperlipidemia. (Exhibit B, pp. 518-521). P.A. Kakani also discussed with Plaintiff the interactions and side effects of his medications, as well as his labs. (Exhibit B, p. 520). P.A. Kakani prescribed the following medications for Plaintiff: (1) Elavil 75mg once orally at bedtime; (2) Motrin 600mg three times a day orally (which was decreased at Plaintiff's request); (3) Mevacor 20mg three times a day orally; (4) Zantac 150mg one to two times a day orally; and (5) Lopid 600mg two times a day orally. (Exhibit B, p. 520). P.A. Kakani then requested a follow-up visit to occur on approximately 2/8/06. (Exhibit B, p. 521).

> On 1/29/06, Plaintiff submitted a health care request for services advising that he stopped taking his Mevacor because it allegedly caused muscle pain and requested that it not be ordered any more. (Exhibit B, p. 514). The request was reviewed by RN Douglas, who requested a chart review by the medical service provider. (Exhibit B, p. 514).

> On 2/8/06, P.A. Kakani again saw Plaintiff for a chronic care clinic appointment. (Exhibit B, pp. 507-511). Plaintiff advised P.A. Kakani that he [refused] to take his cholesterol medications. (Exhibit B, p. 507). Plaintiff then signed a release of responsibility form for refusing to take his cholesterol medications, which was witnessed by Beth Fritz, RN. (Exhibit B, pp. 509, 741). P.A. Kakani noted that Plaintiff had poor control of his hyperlipidemia and was refusing his medications. (Exhibit B, p. 509). She noted that she would see him in 6 months and if he was still refusing his medications at that point, she would discontinue his enrollment in the chronic care clinic. (Exhibit B, p. 509). She also continued Plaintiff's prescription for Zantac, Elavil, and Motrin. (Exhibit B, p. 509).

> On 7/17/06, P.A. Kakani again saw Plaintiff for a chronic care clinic appointment. (Exhibit B, pp. 498-501). P.A. Kakani noted that Plaintiff's cholesterol remained high and that he had been refusing his medications for some time. (Exhibit B, p. 499). She also noted that Plaintiff's blood pressure was slightly elevated and that Plaintiff did not want labs. (Exhibit B, p. 499). P.A. Kakani ordered a chest x-ray and a follow-up visit in a month, and noted that she may start Plaintiff on hypertension medications depending on his chest x-ray and his follow-up blood pressure. (Exhibit B, p. 499).

6

On 8/31/06, P.A. Kakani saw Plaintiff for the scheduled follow-up visit. (Exhibit B, pp. 493-496). P.A. Kakani noted that Plaintiff continued to refuse his cholesterol medications and also refused labs, but agreed to get labs done next August. (Exhibit B, p. 496). P.A. Kakani also noted that even though Plaintiff was in poor control of his condition, she would see him in February 2007, for another follow-up visit.  (Exhibit B, p. 496).

On 2/22/07, P.A. Kakani again saw Plaintiff for a scheduled follow-up visit. (Exhibit B, p. 480). P.A. Kakani noted that Plaintiff had elevated cholesterol and was refusing medications and labs. (Exhibit B, p. 480). She also noted that Plaintiff was taking pain medication for his back pain, that he did not want Clinoril, and that he would try Lodine. (Exhibit B, p. 480). She then wrote a one-month order for Lodine. (Exhibit B, p. 481). On 2/33/07, P.A. Kakani renewed Plaintiff's prescription for Lodine and continued it until 8/28/07. (Exhibit B, p. 473). On 4/10/07, P.A. Kakani discontinued Plaintiff's prescription for Lodine and wrote an order for Plaintiff to receive Motrin 400mg two times a day, which was to continue until 8/10/07. (Exhibit B, p. 467).

On 4/30/07, P.A. Kakani saw Plaintiff for a physical examination. (Exhibit B, pp. 457-458). P.A. Kakani noted that Plaintiff still complained of pain and stated that he never received his Motrin, but that he received some Motrin from the dentist. (Exhibit B, p. 457). She also noted that Plaintiff complained of side effects from his Motrin and stated that he took Neurontin in the past, which helped. (Exhibit B, p. 457). P.A. Kakani then continued Plaintiff's present medications, increased his prescription for Elavil, and submitted a request to the Regional Medical Officer for approval for Neurontin 300mg because it was a non-formulary medication. (Exhibit B, p. 457, 456). On 5/1/07, Joseph Savage, D.O., the MDOC Regional Medical Officer approved Neurontin for 60 days. (Exhibit B, p. 455). On 5/1/07, P.A. Kakani wrote a prescription for Neurontin 300mg three times a day orally, which was to expire on 7/1/07.  (Exhibit B, p. 454).

On 5/13/07, Plaintiff submitted a health care request for services requesting to have his Neurontin increased to 600mg or 800mg and requesting to stop Motrin. (Exhibit B, p. 450). On 5/14/07, RN McGaw-Dauer responded to the request by noting that she was requesting a chart review by the MSP. (Exhibit B, p. 450). On 5/15/07, P.A. Kakani reviewed Plaintiff's request for an increase of his Neurontin and noted that he was also on Elavil (another pain medication).  (Exhibit B, p. 449). She noted that she would discuss this with Plaintiff at his next visit.  (Exhibit B, p. 449). She also noted that Plaintiff continued to refuse his cholesterol medications and labs. (Exhibit B, p. 449).

On 6/25/07, Plaintiff submitted a health care request for services stating that he sent three requests last month concerning an increase of Neurontin and lowering

the amount of Motrin that he was receiving. (Exhibit B, p. 446). He stated that the Motrin was killing his stomach and liver. (Exhibit B, p. 446). Lois E. Turbett responded to the kite and advised that she gave Plaintiff's request and medical chart to the PA to review. (Exhibit B, p. 446).

On 7/6/07, P.A. Kakani submitted a request to renew Plaintiff's prescription for the off-formulary medication Neurontin. (Exhibit B, p. 441). On 7/12/07, P.A. Kakani noted that the Neurontin had been approved for 60 days. (Exhibit B, p. 436).

On 7/24/07, P.A. Kakani saw Plaintiff for a follow-up visit regarding his Neurontin. (Exhibit B, p. 433). She noted that the Regional Medical Officer approved her request for Neurontin for 60 days and wanted her to complete pain management committee paperwork, which she noted that she already completed. (Exhibit B, p. 433). She then noted that if the Neurontin helped Plaintiff with his pain, it should be continued and she e-mailed the Regional Medical Officer to approve a permanent prescription for Neurontin. (Exhibit B, p. 433).

On 8/14/07, Plaintiff submitted another health care request for services requesting information from PA [sic] regarding Dr. Savage putting him on Neurontin permanently. (Exhibit B, p. 425). RN McGaw-Dauer referred the Plaintiff's medical chart to the MSP. (Exhibit B, p. 425). On 8/15/07, P.A. Kakani saw Plaintiff for a follow-up visit regarding his approval for Neurontin. (Exhibit B, p. 421). She noted that despite her e-mail request for permanent approval for Neurontin, only a 60-day supply was authorized. (Exhibit B, p. 421). She noted that the pain management recommendations were Elavil, Tylenol, and NSAIDS, which Plaintiff had previously tried and did not want. (Exhibit B, p. 421). She noted that when she offered Plaintiff Dilantin, he did not want it. (Exhibit B, p. 421). She then submitted a request for pain management treatment. (Exhibit B, p. 421). On 10/23/07, the MDOC Pain Management Committee responded to P.A. Kakani's request with a recommendation pain management regimen: (1) Tylenol up to 4 GM/day; (2) formulary NSAID of choice up to max dose; (3) Elavil up to 150mg, increase gradually by 10-25mg at a time until increased drowsiness subsides; and (4) Neurontin up to 300mg three times a day. (Exhibit B, pp. 423-424). On 11/6/07, P.A. Kakani again saw Plaintiff, noted that the Pain Management Committee approved a pain management regimen, and wrote a prescription for Neurontin, Elavil (amitriptyline), and Motrin. (Exhibit B, pp. 390-391).

On 4/11/08, P.A. Kakani saw Plaintiff for a physical examination. (Exhibit B, pp. 302-304). As part of the examination, she reviewed Plaintiff's lab results, and noted that he had elevated liver enzymes. (Exhibit B, p. 303). P.A. Kakani then ordered a number of additional lab tests, including a Hepatitis Panel. (Exhibit B, p. 303). On 4/14/08, P.A. Kakani again saw Plaintiff for a follow-up on his labs. (Exhibit B, p. 294-295). She then noted that Plaintiff continued to have elevated liver enzyme levels. (Exhibit B, p. 295). She then submitted a request for Plaintiff to

8

undergo an ultrasound of his liver based upon his elevated liver enzyme levels. (Exhibit B, pp. 297-298). On 4/18/08, the liver ultrasound was authorized. (Exhibit B, pp. 285-286). On 4/21/08, P.A. Kakani again saw Plaintiff for a follow-up of his labs, which continued to reveal elevated but slightly improved liver enzyme levels, and also revealed that Plaintiff was positive for Hepatitis C. (Exhibit B, p. 280). She then completed the paperwork to have Plaintiff treated for Hepatitis C. (Exhibit B, p. 280). On 4/30/08, it was noted that the ultrasound of the liver was scheduled to occur on 5/22/08 at Foote Hospital. (Exhibit B, pp. 272-273).

On 5/22/08, Plaintiff underwent an ultrasound of his liver. (Exhibit B, p. 576-577). The ultrasound revealed the following: (1) successful core biopsy of the liver; (2) gallstones; (3) a 1.2cm echogenic mass on the left lobe of the liver (MRI should be considered to be sure this represents the hemangioma); (4) small right pleural effusion. (Exhibit B, p. 577). On 5/28/08, P.A. Kakani submitted two consultation requests, one for a general/vascular surgery consultation for Plaintiff's gallstones and one for an MRI of the liver. (Exhibit B, pp. 249-250, 246-247).

On 6/6/08, Plaintiff was transferred from ARF (Gus Harrison Correctional Facility) to ACF (Florence Crane Correctional Facility), where he underwent a medical transfer receiving screening performed by Sandra K. Powell, RN. (Exhibit B, pp. 230-232). Plaintiff reported no complaints to RN Powell. (Exhibit B, p. 230). She then performed an examination of Plaintiff, which revealed no physical deformities, no evidence of abuse/trauma, and a healthy general appearance. (Exhibit B, p. 231). She then provided Plaintiff with a health care orientation for access to care, the grievance process, and copayment fees.  (Exhibit B, p. 231).

On 6/9/08, the MRI of the liver requested by P.A. Kakani before Plaintiff's transfer to ACF was authorized. (Exhibit B, pp. 225-226). On 6/10/08, the request for a surgery consultation regarding the gallstones was not authorized by Dr. Squire, a utilization review physician, who recommended that the MRI of the liver should be completed first. (Exhibit B, pp. 223-224).

On 6/19/08, Dr. Gelabert performed a chart review, and noted that the request for vascular surgery submitted by P.A. Kakani was not authorized by the utilization review physician, Dr. Squire, who suggested that they await the results of the MRI of the liver. (Exhibit B, p. 211). Dr. Gelabert then noted that he would await the MRI report and then resubmit a request for a surgery consult if necessary. (Exhibit B, p. 211). On 6/19/08, Plaintiff underwent an MRI of the liver, which revealed a benign lesion such as a cyst or hemangioma in the liver, as well as cholelithisis (aka, gallstones).  (Exhibit B, p. 666-667).

On 7/9/08, Dr. Gelabert reviewed the MRI report. (Exhibit B, pp. 666-667). He then saw Plaintiff to discuss the results of the MRI, which he explained reviewed a hemangioma and gallstones. (Exhibit B, p. 204). Dr. Gelabert then explained that

a request had previously been made for Plaintiff to see a vascular surgeon, but it was pended until the MRI of the liver was completed. (Exhibit B, p. 204). Now that the MRI had been completed, Dr. Gelabert decided to resubmit a request for Plaintiff to see the vascular surgeon. (Exhibit B, p. 204). Dr. Gelabert also noted that Plaintiff was not taking any of the medications recommended by the Pain Management Committee on 10/23/07. (Exhibit B, p. 204). He then completed a consultation request for Plaintiff to have a vascular surgery request for his gallstones. (Exhibit B, pp. 206207). On 7/21/08, Dr. Gelabert completed an administrative progress note and again noted that Plaintiff was not taking any of the four medications recommended by the Pain Management Committee on 10/23/07 for Plaintiff's back pain. (Exhibit B, p. 198). On 7/22/08, the vascular surgery request was authorized.  (Exhibit B, pp. 196-197).

On 8/4/08, Dr. Gelabert had an appointment with Plaintiff. (Exhibit B, p. 191). Dr. Gelabert noted that Plaintiff was there to discuss several issues, the first of which was his Hepatitis C. (Exhibit B, p. 191). Dr. Gelabert noted that a chart review showed that almost all of the tests required for an infectious disease evaluation had been completed, except for the HCV VL BDNA test. (Exhibit B, p. 191). The next issue was chronic back pain treatment. (Exhibit B, p. 191). Dr. Gelabert noted that on 10/07, the Pain Management Committee recommended four medications, but that Plaintiff has refused all of them. (Exhibit B, p. 191). The third issue was regarding the gallstones, and Dr. Gelabert noted that he already made a referral to the general surgeon for the gallstones. (Exhibit B, p. 191). Dr. Gelabert then ordered the HCV VL BDNA test and submitted a consultation request for a reevaluation by the Pain Management Committee of Plaintiff's treatment plan.  (Exhibit B, pp. 191-194).

On 8/11/08, Plaintiff underwent the requested surgery consultation with Michael DeLong, M.D. (Exhibit B, pp. 794-795). Dr. DeLong assessed Plaintiff with probable symptomatic cholelithiasis (aka, gallstones). (Exhibit B, p. 794). He then recommended a cholecystectomy (aka gallbladder removal surgery), and Plaintiff consented to the procedure.  (Exhibit B, p. 795).

On 8/24/08, Janisf Pfost, RN entered a notation in the medical record indicating that Plaintiff's prescription for Ultram had expired and requested Dr. Gelabert to perform a chart review regarding renewing the medication. (Exhibit B, p. 178). On 8/25/08, Dr. Gelabert performed a chart review as requested by RN Pfost. (Exhibit B, p. 174). He then submitted a request to the MDOC Regional Medical Officer to have Plaintiff's Ultram (a non-formulary medication) refilled. (Exhibit B, pp. 174, 173). He also wrote an Order for Plaintiff to be given a 5-day prescription of Ultram until RMO re-approval was obtained. (Exhibit B, p. 172). He also completed a consultation request for Plaintiff to undergo a cholecystectomy with Dr. DeLong. (Exhibit B, pp. 174, 177). That same day, the request was authorized, and Plaintiff was scheduled to undergo gallbladder removal surgery on 9/8/08. (Exhibit B, pp. 175-176). On 8/26/08, Jeffrey C. Stieve, M.D., the MDOC Regional

Medical Officer, approved the request for a renewal of a 2-month prescription of Ultram for Plaintiff to be taken 3 times daily. (Exhibit B, p. 171).

On 9/8/08, as scheduled, Plaintiff underwent his cholecystectomy with Dr. DeLong at Community Health Center of Branch County. (Exhibit B, pp. 803-804). On 9/9/08, Plaintiff was discharged from the hospital back to ACF. (Exhibit B, p. 791). The Discharge Orders recommended that Plaintiff receive Ultram 100mg 3 times a day with 100mg to be given at bedtime and also recommended a follow-up visit with Dr. DeLong on 9/22/08. (Exhibit B, p. 791). On 9/9/08, Dr. Gelabert saw Plaintiff for a follow-up visit after his discharge. (Exhibit B, p. 157). Dr. Gelabert placed Plaintiff on a medical lay-in for 2 days, noted that he could have regular meals, gave Plaintiff milk of magnesia for his abdominal pain, and noted that he would keep Plaintiff on his currently prescribed Ultram. (Exhibit B, p. 157). He also noted that Plaintiff should return to see Dr. DeLong on 9/22/08. (Exhibit B, p. 157). In order to ensure that Plaintiff could see Dr. DeLong, Dr. Gelabert also submitted a consultation request for a visit to occur on 9/22/08. (Exhibit B, pp. 159-160). On 9/9/08, Margaret Ouellette, P.A. wrote an Order for Plaintiff to receive a dose of Ultram 100mg that evening. (Exhibit B, p. 155). On 9/10/08, Margaret Ouellete, P.A. wrote another Order for Plaintiff to receive another dose of Ultram 100mg that evening.  (Exhibit B, p. 155).

On 9/13/08, at 10:00pm, Plaintiff returned to Community Health Center of Branch County with post-surgical abdominal pain that increased since earlier that morning. (Exhibit B, pp. 753-757). The triage nurse then spoke with Dr. DeLong, who advised that he would come in to the hospital to see Plaintiff, and Plaintiff was placed in observation status in the surgical unit.  (Exhibit B, p. 757). Dr. DeLong then examined Plaintiff on the morning of 9/14/08. (Exhibit B, p. 749). Dr. DeLong assessed Plaintiff with abdominal pain of unclear etiology, and ordered a CT of Plaintiff's abdomen. (Exhibit B, p. 749). A CT was obtained and revealed a hugely distended urinary bladder. (Exhibit B, p. 766). Plaintiff was then discharged back to ACF on 9/15/08. (Exhibit B, p. 777). The discharge orders were for Plaintiff to receive Ultram 50mg two times a day, and Ultram 100mg at bedtime.  (Exhibit B, p. 777).

On 9/16/08, Dr. Gelabert saw Plaintiff for a follow-up appointment after his discharge from the hospital. (Exhibit B, p. 138). Dr. Gelabert informed Plaintiff of the new order for Ultram based upon the discharge orders recommendation to give a 50mg dose of Ultram in the morning and at noon, and then a 100mg dose in the evening.  (Exhibit B, p. 138).

Defendants' Brief at pp. 1-10 (docket no. 81).

11

### C.    Eighth Amendment claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.   *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);   *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).   To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.   *Estelle v. Gamble*, 429 U.S. 97 (l976).   A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.   *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition.   *Hudson*, 503 U.S. at 8-9.   With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."   *Id.* at 8 (internal citations and quotation marks omitted).   Similarly, "[b]ecause society does not expect

12

that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. The conduct for which Eighth Amendment liability attaches must be more than negligence, "it must demonstrate deliberateness tantamount to an intent to punish." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (internal citation omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 1.     Defendant CMS

Plaintiff sets forth no particular allegations against CMS. Rather, he simply lists CMS as a defendant. Second Amend. Compl. at p. 2. Plaintiff's bare allegations are insufficient. A plaintiff who sues a private or public corporation for constitutional violations under § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996). The Sixth Circuit has held that like a municipal corporation, "CMS's liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights."

13

*Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001).  Thus, in order to state a § 1983 claim against CMS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury."  *Moreno v. Metropolitan General Hosp.*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir.  March 28, 2000).  "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law.  Some factual basis for such claims must be set forth in the pleadings."  *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986).  *See  Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986) (a plaintiff in a § 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which  [he] complains.").

In the absence of any allegation of wrong-doing, it appears that plaintiff seeks to hold CMS liable under a theory of vicarious liability for the acts performed by the individual medical providers.  It is well settled that a § 1983 action cannot be based on a theory of respondeat superior.  *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978); *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995).  For these reasons, CMS is entitled to summary judgment.

### 2.      Defendant P.A. Kakani

Plaintiff's claim against P.A. Kakani arises from the June 25, 2007 incident, when Kakani allegedly refused to give plaintiff adequate pain medication.  Second Amend. Compl. at p. 5.  Plaintiff's claim is unsupported by any evidence.  The uncontradicted medical record establishes that on that date, plaintiff submitted a health care request regarding three previous requests in which he apparently wanted to substitute Neurontin for Motrin.  Exh. B-2 at p. 446.  Plaintiff stated:

The Motrin is killing my stomach and liver.  Please call me out to see a doctor as soon as possible.

14

*Id.*  Lois E. Turbett responded to the kite and advised that she gave plaintiff's request and medical

chart to the PA to review.  *Id.*  On July 6, 2007, P.A. Kakani submitted a request to renew plaintiff's

prescription for the off-formulary medication Neurontin (300 mg) to treat back pain.  *Id.* at p. 441.

On July 12, 2007, P.A. Kakani noted that the Neurontin had been approved for 60 days.  *Id.* at p.

436.  On July 24, 2007, P.A. Kakani saw plaintiff for a follow-up appointment regarding the

Neurontin.  *Id.* at p. 433.  At that time, plaintiff stated that he had taken Motrin for so long that he

did not want to take it anymore.  *Id.*  P.A. Kakani noted that the Regional Medical Officer had

approved Neurontin for 60 days and that she (Kakani) had completed pain management committee

paperwork for the prescription.  *Id.*  P.A. Kakani then noted that if the Neurontin helped plaintiff

with his pain, it should be continued and she e-mailed the Regional Medical Officer to approve a

permanent prescription for Neurontin.  *Id.*

   Viewing the evidence in the light most favorable to plaintiff, the record reflects that

P.A. Kakani received plaintiff's request for medication other than Motrin, issued a 60-day

prescription for Neurontin and advocated on plaintiff's behalf for a permanent Neurontin

prescription.  Plaintiff received the medication requested.  There is no factual basis to support

plaintiff's claim that P.A. Kakani refused to provide him with adequate pain medication.

Accordingly, P.A. Kakani is entitled to summary judgment.

   **3.**  **Defendant Dr. Gelabert**

   Plaintiff's claims against Dr. Gelabert arise from events that occurred on four

operative dates: June 6, 2008; July 9, 2008; August 26, 2008; and September 9, 2008.  *See* Second

Amend. Compl. at pp. 6-8.

15

a.      **June 6, 2008**

Plaintiff alleged that Dr. Gelabert was deliberately indifferent to his serious medical needs by refusing to send him to a specialist for gallstones, which resulted in  abdominal pain and the loss of his gallbladder.  *Id.* at p. 7.  As the court previously discussed, plaintiff was first diagnosed with gallstones on May 22, 2008, when he underwent an ultrasound of his liver for an unrelated medical condition.  Exh. B-2 at pp. 576-77.  A few days later, a consultation request was submitted for a vascular surgeon to review the gallstones.  Exh. B-1 at pp. 249-50.  On June 6, 2008, plaintiff was transferred to ACF, the correctional facility where Dr. Gelabert worked.  *Id.* at pp. 230-32.  On June 10, 2008, the consultation request issued from ARF was not approved. *Id.* at pp. 223-24.  Under the circumstances, it was recommended that plaintiff should undergo an MRI.  *Id.*  On June 19, 2008, Dr. Gelabert noted that the request for surgery was not approved, that he would wait for the MRI report of the liver, and that he would re-submit the request for surgery if necessary.  *Id.* at p. 211.  Plaintiff underwent the MRI on June 19, 2008.  Exh. B-2 at pp. 666-67.  On July 9, 2008, Dr. Gelabert met with plaintiff regarding the MRI results, noted the diagnosis of Hepatitis, advised plaintiff that he had been referred to a surgeon for the gallstones but the request was placed on hold by CMS pending the MRI results, and stated that he would submit a consultation request for gallstone surgery.  *Id.*; Exh. B-1 at pp. 204, 206-07.   During the meeting, Dr. Gelabert noted that plaintiff was not taking the pain medication recommended in 2007.  Exh. B-1 at p. 204.  That same day, Dr. Gelabert submitted the request for vascular surgery consultation, which was authorized on July 22nd.  Exh. B-1 at pp. 196-97, 206-07.  The surgeon examined plaintiff on August 11, 2008 and recommended gallbladder removal surgery, which was performed on September 8, 2008.  Exh. B-2 at pp. 794-95, 803-04.

16

Viewing the evidence in the light most favorable to plaintiff, the record reflects that Dr. Gelabert promptly treated plaintiff's recently discovered gallstone problem.  After receiving the MRI results, Dr. Gelabert met with plaintiff and that same day submitted a request for a surgical consultation.  Plaintiff saw a surgeon who treated him by removing the gall bladder.  There is no factual basis to support plaintiff's claim that Dr. Gelabert refused to send him to a specialist regarding his gallstones.  Accordingly, Dr. Gelabert is entitled to summary judgment on this claim.

### b.      July 9, 2008

Plaintiff alleged that Dr. Gelabert was deliberately indifferent to his serious medical needs on July 9, 2008, by refusing to give him adequate pain medication after plaintiff fell (injuring his head, back and lower spine), refused to give him adequate pain medication for his abdominal pain and heart burn due to gall stones, and refused to send him to a specialist to remove his gall stones.  Second Amend. Compl. at p. 5.  As previously discussed, plaintiff's claim that Dr. Gelabert refused to send him to a specialist for a consultation to remove his gallstones is patently false.  In addition, there is no evidence that plaintiff fell or was hospitalized on or about July 9, 2008 or that he required additional pain medication due to such injury.  On the contrary, Dr. Gelabert noted that plaintiff was not taking the pain medication recommended in 2007.  Exh. B-1 at p. 204. Accordingly, Dr. Gelabert is entitled to summary judgment on this claim.

### c.      August 26, 2008

Plaintiff alleged that Dr. Gelabert was deliberately indifferent to his serious medical needs on August 26, 2008, by allowing his pain medication to expire without any reason, resulting in horrible pain.  Second Amend. Compl. at p. 5.  The record reflects that two days before the alleged incident, on August 24, 2008, a nurse noted that plaintiff's Ultram prescription had expired

17

and  requested that Dr. Gelabert perform a chart review to renew the prescription.  Exh. B-1 at p.

178.  *The next day*, Dr. Gelabert reviewed the request and performed a chart review, submitted a

request for approval of a non-formulary medication (Ultram 100 mg), and wrote an order for

plaintiff to be give a five-day supply of Ultram until the prescription renewal was authorized.  *Id.*

at pp. 172-74.  On August 26, 2008 - the day that plaintiff alleged Dr. Gelabert allowed his pain

medication to expire - the MDOC Regional Medical Officer approved Dr. Gelabert's request for the

Ultram prescription.  *Id.* at p. 171.  Plaintiff's claim that Dr. Gelabert allowed his pain medication

to expire on August 26, 2008 is also not supported by the record and Dr. Gelabert is also entitled to

summary judgment on this claim.

### d.        September 9, 2008

Plaintiff alleged that on September 9, 2008, Dr. Gelabert refused to prescribe the

recommended post-surgical pain medication (four times daily) and told plaintiff, an indigent, to

purchase Motrin from the prison store.  Second Amend. Compl. at p. 7.  As previously discussed,

plaintiff underwent gall bladder surgery on September 8, 2008.  The hospital discharge orders

instructed plaintiff to take Ultram 100mg three times a day and 100 mg at bedtime.  Exh. B-2 at p.

791.  Dr. Gelabert saw plaintiff on September 9, 2008, examined him and instructed plaintiff to

continue on the existing Ultram 100 mg prescription TID (three times a day).  Exh. B-1 at p. 157.

There is no evidence regarding plaintiff's use of Motrin on this date.

Plaintiff's claim appears to be that Dr. Gelabert was deliberately indifferent to his

serious medical needs because the doctor prescribed Ultram 100 mg three times daily, rather than

the hospital recommendation of Ultram 100 mg three times daily and one 100 mg at bed time.  Based

on his examination of plaintiff on September 9th, Dr. Gelabert concluded that plaintiff needed only

18

three doses of Ultram per day. Dr. Gelabert's disagreement with a pain medication recommended by an outside doctor is not grounds for an Eighth Amendment claim. "Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). As the court observed in *Douglas v. Stanwick*, 93 F.Supp.2d 320 (W.D. N.Y. 2000):

> Not every physician will treat every ailment in exactly the same manner. That does not mean that one of the physicians must be acting with deliberate indifference to the patient's needs. That is particularly true when one of the physicians is more familiar with the jail or prison environment, and therefore more sensitive to the need to restrict narcotics use.

*Douglas*, 93 F.Supp.2d at 325 (listing cases). *See also, White v. Napoleon*, 897 F.2d 103, 110 (3rd Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir.1977) (where a prisoner's private physician recommended a course of treatment for the plaintiff's condition, a prison doctor's use of a different treatment regimen did not amount to deliberate indifference for purposes of an Eighth Amendment claim). *See generally, Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) ( "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law"). Accordingly, Dr. Gelabert is entitled to summary judgment on this claim.

### III.     Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion

for summary judgment (docket no. 81) be **GRANTED** and that this action be **DISMISSED**.


Dated:  December 2, 2011                          /s/ Hugh W. Brenneman, Jr.
                                                  HUGH W. BRENNEMAN, JR.
                                                  United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).